UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
In re:

THE GREAT ATLANTIC & PACIFIC TEA                           **OPINION AND ORDER**
COMPANY, INC., *et al.*,

                                        Debtors.
------------------------------------------------------------------------x
ANDROSE ASSOCIATES OF ALLAIRE, LLC,


                                        Appellant,
                  - against -                                     11-CV-5888 (CS)


THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al.*,

                                        Appellees.
------------------------------------------------------------------------x


<u>Appearances</u>:

Scott R. Kipnis
Nicholas B. Malito
Hofheimer Gartlir & Gross, LLP
New York, New York
*Counsel for Appellant Androse Associates of Allaire, LLC*

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
Andrew M. Genser
Nathaniel J. Kritzer
Kirkland & Ellis LLP
New York, New York

James J. Mazza, Jr.
Kirkland & Ellis LLP
Chicago, Illinois
*Counsel for Appellees The Great Atlantic & Pacific Tea Company, Inc., et al.*

<u>Seibel, J.</u>

Before the Court is the appeal of Androse Associates of Allaire, LLC ("Androse" or "Appellant") from the Bankruptcy Court's Order ("Final Order")[1] granting a motion to assume certain unexpired leases and related subleases of non-residential real property (the "Assumption Motion"), (Bankr. Doc. 1959),[2] of The Great Atlantic & Pacific Tea Company, Inc. ("A&P") and certain of its affiliates (collectively, "Appellees" or "Debtors").  For the reasons stated below, the Bankruptcy Court's Final Order is AFFIRMED.

## I.    BACKGROUND

On or about May 1, 1986, Supermarkets General Corporation and Levcom-Allaire Village Associates ("Levcom") entered into a lease for certain non-residential real property located at Allaire Village Plaza in Wall Township, New Jersey (the "Lease").  (Bankr. Doc. 2112 ¶¶ 2, 3; *see generally* Lease.[3])  Subsequently, Pathmark Stores, Inc. ("Pathmark"), a debtor in the underlying bankruptcy, acquired Supermarkets General Corporation, and Levcom assigned the Lease to Androse.  (Bankr. Doc. 2112 ¶ 3.)

The Lease is for a twenty-five year term, subject to possible extensions, at an annual rent of $470,630, exclusive of taxes and common area maintenance charges.  (*Id.*)  The Lease contemplated that Pathmark's store was one of many stores in a "Shopping Center" named "Allaire Village Plaza," (*see, e.g.*, Lease ¶¶ 1.1(a); 2.1; 3.2; 7.1; 7.4; 7.5; 9.2–9.5; 10.1; 11.1); indeed, it was the "anchor store" there, (*see* Bankr. Doc. 2112 ¶ 4).  Under the Lease, Pathmark was required to open the store "for business to the public as a supermarket, but thereafter . . .

---

[1] "Final Order" refers to the Bankruptcy Court's Order Granting Debtors' Motion Pursuant to Sections 363(b) and 365(a) of the Bankruptcy Code Authorizing the Debtors to Assume Certain Unexpired Leases and Related Subleases of Non-Residential Real Property.  (Doc. 1 Ex. 1.)

[2] "Bankr. Doc." refers to documents filed in the Bankruptcy Court for the Southern District of New York under docket number 10-B-24549.

[3] "Lease" refers to the Lease between Levcom and Supermarkets General Corporation, dated May 1, 1986, as amended.  (Bankr. Doc. 2112 Ex. 1.)

[was] not . . . obligated to conduct, or to remain open for the conduct of, any business." (Lease ¶ 6.1.)

At the time that Pathmark acquired the Lease, Pathmark and A&P did not have any relationship with each other.  In 2007, however, A&P, which operated an A&P store directly across the street from Allaire Village Plaza, acquired Pathmark.  (*See* Bankr. Doc. 2112 ¶ 4.) Pathmark operated the Allaire Village Plaza store until sometime in 2009 when it "went dark" and ceased its operations there, although it remained the lessee of the property.  (*See id.*)  In the time since the Pathmark store went dark, Appellant has contended with other tenants of Allaire Village Plaza vacating their locations and asking for rent concessions because the anchor store has not been operational and thus the shopping center has been attracting fewer customers.  (*See id.*)

Appellees commenced their bankruptcy case on December 12, 2010 by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Code").  (Bankr. Doc. 1.)  At the outset of the case, Appellees entered into an $800 million debtor-in-possession post-petition financing facility (the "DIP Facility") to aid their restructuring efforts.  (*See* Bankr. Doc. 1959 ¶ 2.)  Appellees were given until April 26, 2011 to reject any unexpired non-residential real property leases under Section 365 of the Code.  (*See id.* ¶ 2.)  Together with "substantial involvement of the official unsecured creditors' committee . . . and other key constituents," Appellees had their real estate advisor, Hilco Real Estate LLC, "review[] their store portfolio to identify opportunities to exit burdensome lease arrangements" and "determin[e] the value of retaining" other leases.  (*Id.* ¶ 3.)  After completing this analysis, Appellees decided to reject 150 "dark store" leases and subleases, and exit or sell 57 other operating locations.  (*Id.*)  Appellees

also obtained rent concessions from certain landlords in efforts to generate approximately $14 million in savings over the life of certain leases they sought to assume.  (*Id.*)

On June 22, 2011, Appellees filed their Assumption Motion with the Bankruptcy Court seeking entry of an order authorizing Appellees, among other things, to assume 205 leases and 98 related subleases of real property (the "Assumed Leases").  (*See id.* at 2.)  In determining which leases to assume, Appellees had "implemented a systematic process to determine whether to retain or exit store locations," (Bankr. Doc. 2106 ¶ 7), and had "taken into account the cost to cure any existing defaults under the Assumed Leases," (Bankr. Doc. 1959 ¶ 5), each store's potential for rehabilitation or cost savings from closure, (*id.* ¶ 11; *see* Bankr. Doc. 2106 ¶ 7), the effect of assumption or rejection on other restructuring initiatives, (Bankr. Doc. 1959 ¶ 11; Bankr. Doc. 2106 ¶ 7), and that closing some stores would not result in savings to Appellees' estate "and would forfeit the strategic benefits offered by keeping such stores in their portfolio," (Bankr. Doc. 1959 ¶ 31).  The Assumption Motion pertained to all the Assumed Leases, which included the Lease at Allaire Village Plaza, but did not specifically discuss that lease.  (*See generally id.*)

Appellees represented to the Bankruptcy Court that their decision to assume the Assumed Leases satisfied the business judgment standard.  (*See* Bankr. Doc. 2106 ¶ 12 (decision is "product of substantial process, analysis, and negotiations, and . . . is a sound exercise of the [Appellees'] business judgment, utilizing the extensive expertise of the [Appellees'] management and professionals"); *see id.* ¶¶ 13–25 (explaining Appellees' process and rationale for assuming).)  To that end, Appellees stated that they took into consideration that "[i]n a highly competitive industry with relatively low margins, a competitor's ability to take over a strategic location, which may not have been operated profitably by the [Appellees], could detrimentally

affect the [Appellees'] store locations in the surrounding geographic area." (Bankr. Doc. 1959 ¶ 28.)  Appellees represented that they would cure all monetary defaults,[4] and that they had provided adequate assurance of future performance for the Assumed Leases under which they had defaulted based on their cash on hand and the proceeds from the DIP Facility.  (*See* Bankr. Doc. 1959 ¶¶ 39, 41; Bankr. Doc. 2106 ¶ 26 ("The [Appellees] collectively have in excess of $300 million in cash and cash-equivalent investments (as well as access to additional undrawn proceeds of the DIP Facility's revolver).").)

On July 1, 2011, Appellant filed an objection to the Assumption Motion.  (*See* Bankr. Doc. 2112.)  Appellant argued that Appellees had not provided adequate assurance of future performance for the assumption of a shopping center lease under Section 365(b)(3) because Appellees had not made assurances concerning "the source of rent and other consideration due under the Lease," (*id.* ¶ 6 (internal quotation marks omitted)), and, further, Appellees had not (1) given Appellant a security deposit or guarantee, (2) filed a plan of reorganization, or (3) presented specific information demonstrating their ability to make future rental payments or become profitable, (*id.* ¶ 11).  Appellant also argued that Appellees had failed to demonstrate that the assumption of the Lease was a sound business judgment for a store that was not operational.  (*Id.* ¶ 17.)  Appellant represented to the Bankruptcy Court that it had offered Appellees $1.25 million to terminate the Lease, but that Appellees rejected the offer without demonstrating the strategic value of the Lease.  (*See id.*)

On July 6, 2011, Appellees filed an omnibus reply in support of their Assumption Motion, (*see* Bankr. Doc. 2156), and this time made arguments specifically regarding the Lease. For example, Appellees stated that Appellant was not entitled to additional assurances that are

---

[4] Specifically, Appellees were in monetary default under the Lease in the amount of $42,300.37.  (*See* Bankr. Doc 2181, Ex. 1, at Entry 292.)

generally provided to landlords of real property in a shopping center under Section 365(b)(3) of the Code, because (1) Appellant had not set forth evidence demonstrating that it qualified as such a landlord, (*id.* ¶ 18); (2) certain Section 365(b)(3) factors were inapplicable to the case, (*see id.* ¶¶ 20–21); and (3) Appellees were not seeking to assign the Lease and had adequately assured Appellant based on their cash on hand, (*see id.* ¶ 20).  Appellees also argued that there was "obvious value" to the Lease because Appellant was willing to pay $1.25 million to terminate it and there were potential offers from other bidders, which supported the conclusion that the decision to assume the Lease was based on an exercise of Appellees' sound business judgment. (*Id.* ¶ 24.)

On the same day, Appellant filed an amended objection to the Assumption Motion, (*see* Bankr. Doc. 2164), that set forth the same arguments as before, and added an additional argument regarding Appellees' failure to comply with certain insurance requirements under the Lease, which allegedly created a non-monetary default that Appellant believed had to be cured prior to assumption, (*see id.* ¶¶ 14–16).

On July 7, 2011, the Bankruptcy Court heard oral argument on the Assumption Motion (the "Hearing") from both Appellant and Appellees.  The Bankruptcy Court granted the Assumption Motion and stated its reasons on the record.  (*See* Hr'g Tr. 92:20–104:21.)[5]  As to whether Appellees had appropriately exercised their business judgment in deciding to assume the Lease, Judge Drain found that their decision was made, among other things, after "a lengthy and thorough process . . . with heavy involvement by their retained professionals" and consideration of the value of the Lease to the bankruptcy estate.  (*Id.* at 95:5–18.)  On the issue of adequate assurance of prompt cure, Judge Drain had no doubt that Appellees would promptly cure the

---

[5] "Hr'g Tr." refers to the transcript of the Hearing relating to the Assumption Motion held by Bankruptcy Judge Robert D. Drain on July 7, 2011.  (Appellant's App., (Doc. 8 Ex. 1), 64–104.)

$42,300.37 pre-petition monetary default "within ten days of the entry of the [Final Order]" based on Appellees' "cash position, as well as the availability to it of amounts under the [DIP Facility]." (*See id.* at 94:20–95:4.) Further, he held that there was no requirement under the Lease that Appellees maintain insurance with a specific deductible limit and, in any event, based on the Appellees' cash position, a $500,000 deductible on the insurance policy did "not create any issue as to adequate assurance of prompt cure." (*See id.* at 97:15–19, 97:25–98:3.) As to adequate assurance of future performance, Judge Drain determined, among other things, that Appellees had "sufficient cash on hand and on tap under its [DIP Facility] . . . to perform under this lease" and that the Lease was apparently valuable, considering that the unsecured creditors' committee supported the Assumption Motion and Appellant sought "to buy back the lease for a substantial sum." (*Id.* at 101:21–102:11; *see id.* at 101:16–102:4 ($300 million cash and cash equivalents; DIP Facility; value of Lease to bankruptcy estate).) Finally, on the issue of whether the Lease related to real property that was part of a "shopping center" within the meaning of Section 365(b)(3) of the Code, Judge Drain determined that testimony on this issue was not necessary because it was an issue he did not need to decide. (*See id.* at 98:19–99:11; *see also id.* at 99:1–5 (noting that Appellees had objected to testimony of Appellant's witness on this issue because witness had not been previously identified to Appellees and thus Appellees were not able to take deposition prior to hearing).) Rather, Judge Drain discussed the Section 365(b)(3) factors with Appellant's counsel and determined, with counsel's concurrence, that the only factor applicable to this case was subsection (A), which requires that a bankruptcy court find adequate assurance of the source of rent and other consideration due under the lease. Because that determination required the same inquiry that he had to make under the general Section 365(b)(1)(C) analysis of adequate assurance of future performance, Judge Drain concluded that

he did not need to determine under these facts whether the Lease was for a store in a shopping center.  (*See id.* at 99:12–100:20.)

For all these reasons, the Bankruptcy Court granted the Assumption Motion, (*see id.* at 104:20–21), and entered its Final Order granting Appellees' Assumption Motion the next day, (*see* Final Order).

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges."  28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions *de novo*.  *Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009); *see* Fed. R. Bankr. P. 8013 (district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").

### B.   <u>Business Judgment</u>

Under Section 365 of the Code, subject to the bankruptcy court's approval, a debtor has the option to assume or reject an unexpired lease at any time after the commencement of a bankruptcy case and before the confirmation of the plan of reorganization.  *See* 11 U.S.C. § 365(a), (d)(2).  It is well established that the question of whether an unexpired lease should be assumed and on what terms is one of business judgment.  *See, e.g.*, *Grp. of Institutional Investors*

*v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *ReGen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484, 488–89 (2d Cir. 2008); *In re Rock 49th Rest. Corp.*, No. 09-14557, 2010 WL 1418863, at *4 (Bankr. S.D.N.Y. Apr. 7, 2010). "The act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services." *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir. 2000) (alteration and internal quotation marks omitted); *see Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (limited purpose of motion to assume is to ensure "that valuable property is preserved and burdensome property is discarded").

      Accordingly, in reviewing a debtor's decision to assume a lease, the bankruptcy court "plac[es] itself in the position of the . . . debtor-in-possession and determin[es] whether assuming [it] would be a good business decision or a bad one." *In re Orion*, 4 F.3d at 1099; *see COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008) ("This standard rather obviously presupposes that the estate will assume a [lease] only where doing so will be to its economic advantage . . . .") "The Code does not condition the right to assume . . . on lack of prejudice to the non-debtor party," and "the disruption of non-debtors' expectations of profitable business arrangements" is "common in bankruptcy proceedings." *In re Penn Traffic Co.*, 524 F.3d at 382. Thus, "[a]s long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc. (In re Allies Tech., Inc.)*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982).

Appellant argues that the Bankruptcy Court applied its own business judgment, rather than Appellees' business judgment, by introducing "a speculative argument concerning which party stood to gain the most leverage from assumption and conclud[ing] that the [Appellees] could extract greater value for the lease by spending $700,000 per year to maintain a dark non-operating store--an argument not even raised by the [Appellees]." (Appellant's Br. 12; *see* Appellant's Reply Br. 2–4.)[6] Further, Appellant argues that "the real reason" Appellees assumed the Lease was because they could not give sufficient notice to their DIP Facility lender by April 26, 2011, the deadline by which Appellees agreed that they would reject leases. (*See* Appellant's Br. 13–14.) Finally, Appellant argues that Appellees' business judgment analysis was flawed because (1) the store is dark and thus cannot be profitable to the bankruptcy estate, and (2) Appellees did not introduce sufficient evidence of the value of the Lease to the estate or the extent to which the Lease could be monetized. (*See id.* at 14–15; Appellant's Reply Br. 3–4.) Appellees argue that the Bankruptcy Court appropriately (1) took account of the "thorough process" through which Appellees went to reach the decision to assume the Lease, including garnering support for the assumption from the official unsecured creditors' committee and other key constituents; (2) considered that Appellees' negotiating leverage with respect to a buyout of the Lease would improve upon assumption; and (3) determined that had Appellees not assumed the Lease, under circumstances where Appellant had refused to extend the April 26, 2011 deadline to reject it, the value of the Lease to the bankruptcy estate—a value Appellants had put at $1.25 million before knowing whether the Assumption Motion would be granted or not— would be lost. (*See* Appellees' Br. 5–10.)[7]

---

[6] "Appellant's Br." refers to the Brief of Appellant Androse Associates of Allaire, LLC. (Doc. 8.) "Appellant's Reply Br." refers to the Reply Brief of Androse Associates of Allaire, LLC. (Doc. 14.)
[7] "Appellees' Br." refers to the Brief of Debtors-Appellees. (Doc. 12.)

On review of the record, I do not find any clear factual error in the Bankruptcy Court's conclusion that the decision to assume the Lease was supported by Appellees' sound business judgment.  Judge Drain considered Appellees' representations that, along with their advisors, they completed a thorough review of various leases—including leases pertaining to "dark stores" and specifically this Lease, (*see* Hr'g Tr. 86:7–11 (strategic reasons to keep Lease; received offers from third parties to buy out Lease; "So we have done our work carefully on this lease."); *id.* at 103:11–14 ("[T]he Court's deference to the debtor's decision to assume a lease becomes considerably greater when it is clear from the record that the debtor has gone through a thorough process to make that decision."))—to determine whether assuming the Lease was in the best interest of the estate.  *See Allied Tech.*, 25 B.R. at 495 (bankruptcy court should generally not second guess debtor's determination that assumption is in its best interest).  Further, the unsecured creditors' committee—the group of creditors with the most to lose in a bankruptcy case—was consulted and did not object to Appellees' decision to assume the Lease, and Appellees' DIP Facility lender also approved.  (*See* Hr'g Tr. 95:11–18; *id.* at 103:17–21.)  The only objecting party was Appellant, which Judge Drain found "obviously ha[d] a unique parochial interest in whether its lease is assumed or not."  (*Id.* at 103:22–24.)  Moreover, Judge Drain noted that the value of the Lease to the estate was apparent, as Appellant was willing to buy Appellees out of the Lease for $1.25 million, (*see id.* at 102:9–11), and he believed that the value of the property would only increase upon assumption because Appellees could further negotiate with parties that were interested in taking over the Lease, (*see id.* at 104:14–19).[8]  That

---

[8] Judge Drain did not err in declining to hear testimony of Appellant's witness—who had not been identified to Appellees prior to the Hearing, *see* Fed. R. Bankr. 9014(d) ("Testimony of witnesses with respect to disputed material factual issues shall be taken in the same manner as testimony in an adversary proceeding."); *id.* 9014(c) ("An entity that desires to perpetuate testimony may proceed in the same manner as provided in Rule 7027 for the taking of a deposition before an adversary proceeding.")—regarding the supposed effect of market conditions on the supposed intentions of a potential tenant that Appellant had secured.  Even if the witness had been identified prior to the Hearing and purported to describe what that potential tenant had said—which he did not—such testimony would

Appellees may not have specifically articulated that view does not mean Judge Drain, in making that common-sense observation, failed in his duty to examine the transaction from the debtor's perspective.  Judge Drain also considered Appellees' representations concerning the strategic benefits for keeping the Lease, including that assuming the Lease would help ensure that the A&P store across the street from Allaire Village Plaza remained profitable.  (*See id.* at 85:23– 86:7.)  Because the Bankruptcy Court considered all these facts, and "plac[ed] itself in the position of the . . . debtor-in-possession and determin[ed] . . . [that] assuming the [Lease] would be a good business decision," because "valuable property [was] preserved," *In re Orion*, 4 F.3d at 1099, it did not err in determining that Appellees' decision to assume the Lease was supported by good business judgment.

### C.      Adequate Assurance Analysis

Even after a court renders a determination on the debtor's business judgment in the context of the assumption of an unexpired lease, Section 365(b)(1) of the Code provides, in pertinent part, that if there has been a default under the lease, a debtor in possession ("DIP") may not assume the lease unless it:

> (A)  cures, or provides adequate assurance that the [DIP] will promptly cure, such default . . .;
>
> . . . and
>
> (C)  provides adequate assurance of future performance under such . . . lease.

11 U.S.C. § 365(b)(1).

The term "adequate assurance of future performance" is not statutorily defined, but courts have determined that "[w]hether 'adequate assurance of future performance' has been provided

---

have been hearsay (the argument raised for the first time on appeal regarding present sense impression being unpersuasive).  In any event, Appellant's counsel admitted that the testimony would be conjecture.  (Hr'g Tr. 76:20– 25.)

is determined by the facts and circumstances of each case." *In re M. Fine Lumber Co.*, 383 B.R. 565, 572 (Bankr. E.D.N.Y. 2008). A debtor need not provide "an absolute guarantee of performance"; rather, "[i]t must simply appear that the rent will be paid and other lease obligations met. . . . The emphasis is on protection." *Id.* at 573 (alteration and internal quotation marks omitted); *see In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986) ("As designed by Congress, the phrase does not mean absolute insurance that the debtor will thrive and make a profit.") (internal quotation marks omitted). To determine whether a landlord is adequately assured, courts look to a non-exclusive list of factors, including the debtor's payment history, the extent and history of defaults, presence of a guarantee and/or a security deposit, evidence of profitability, a plan with earmarked funds exclusively for the landlord, the general outlook in the debtor's industry, and whether the lease is at or below the prevailing market rate, *see In re M. Fine Lumber Co.*, 383 B.R. at 573–74 (collecting cases); *In re Gen. Oil Distribs., Inc.*, 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1982) ("What constitutes adequate assurance is a factual question to be determined on a case by case basis with due regard to the nature of the parties, their past dealings and present commercial realities."), "to afford landlords with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy," *In re Natco Indus., Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985). But "Section 365 . . . does not give a landlord the right to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might seek to escape the bargain it made." *In re Rock 49th Rest. Corp.*, 2010 WL 1418863, at *7 (internal citation omitted).

Appellant argues that Appellees failed to carry their burden of demonstrating that they could provide adequate assurance of future performance because Appellees "failed to disclose

the true extent of their cash liquidity," and instead relied on a "vague statement about $300 million in cash and cash investments," depended too heavily on the short-term money in the DIP Facility without considering the availability of long-term funds, failed to show that they had become profitable during the bankruptcy case, and did not specifically address Pathmark's tenancy with Appellant in the adequate assurance analysis.  (*See* Appellant's Br. 20; Appellant's Reply Br. 8–9.)  Further, Appellant claims that the Bankruptcy Court erred by not taking testimony, reviewing documentary evidence, or conducting a full analysis of the list of factors referenced above.  (*See* Appellant's Br. 19.)  Appellees argue, among other things, that the Bankruptcy Court correctly considered the steps that Appellees had taken towards reorganization and implementation of their business plan, the over-$300 million in cash and cash-equivalent investments, the undrawn proceeds under the DIP Facility, and the intrinsic value of the Lease, considering that Appellant was willing to buy Appellees out of the Lease for $1.25 million.  (*See* Appellees' Br. 11–14.)

Having conducted a *de novo* review of the applicable law and considered the factual findings of the Bankruptcy Court, I do not find any legal or clear factual error in the Bankruptcy Court's conclusion that Appellees had demonstrated adequate assurance both of prompt cure of default and of future performance.  The Bankruptcy Court had before it information concerning Appellees' access to $300 million in cash and cash-equivalent investments, as well as undrawn proceeds from the $800 million DIP Facility, and thus Appellees' ability to cover the approximately $7 million in cure costs that resulted from defaults across all the Assumed Leases and future rent payments.  (Bankr. Doc. 2016 ¶ 26.)  Further, with respect to future performance, Appellees represented that they had a "substantial cash position, [the] debtor-in-possession financing facility," (Hr'g Tr. 82:22–24; *see id.* at 101:19–24), and that because "the landlord

ha[d] made an offer to terminate the lease for 1.3 million dollars[,] [t]he debtors and their key stakeholders believe[d] this [lease] [wa]s an asset of the estate," (*id.* at 82:23–83:4; *see id.* at 102:9–22).[9]

Because the Bankruptcy Court considered the appropriate Section 365(b)(1) requirements and the adequate assurance factors that are relevant to the facts of this case, including the source of rent from Appellees' cash on hand and the DIP Facility, that there was no evidence of prior significant defaults on the Lease, and that the Lease was a valuable asset to the estate, it did not err in determining that Appellees had carried their burden to show that Appellant was adequately assured of prompt cure and future performance under Section 365(b)(1).

**D.      Shopping Center Analysis under Section 365(b)(3)**

Section 365(b)(3) of the Code "imposes heightened restrictions on the assumption and assignment of leases for shopping centers . . . to protect the rights of the lessors and the center's other tenants," *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990), by requiring the DIP to provide additional adequate assurance:

> (A)  of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B)  that any percentage rent due under such lease will not decline substantially;

---

[9] Appellant argues that Appellees have failed to distinguish cases in which courts looked to other factors to determine what qualifies as adequate assurance.  (*See* Appellant's Reply Br. 9.)  While it may well be that certain courts have found adequate assurance based on circumstances such as substantial capital investments, rent deposits, and irrevocable letters of credit, (*see id.*), other courts have looked to different factors on a case-by-case basis, such as the willingness and ability of the debtor to fund the cure payments, *see In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986), market value and salability of the lease, *see In re M. Fine Lumber Co.*, 383 B.R. at 573, and the history of defaults and the record of the debtor's prior payments, *see In re Westview 74th St. Drug Corp.*, 59 B.R. at 755 (finding debtor's history of payment "exemplary" and the pre-petition default "miniscule").  No single factor is determinative, and the factors present here sufficed to support Judge Drain's conclusions regarding adequate assurance.

(C)   that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D)   that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).  Section 365(b)(3) was implemented "to remedy three serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code," including (1) the hardship caused to landlord and tenant resulting from vacancy or partial operation of the debtor's space in the shopping center; (2) the uncertainty of whether the landlord will continue to receive rent payments; and (3) the disruption to the tenant mix of the shopping center.  *In re Joshua Slocum Ltd.*, 922 F.2d at 1088 (internal quotation marks omitted).  Because the Code does not define "shopping center," courts have interpreted the term on a case-by-case basis and generally consider, among other criteria, combination of leases, whether all leases are held by single landlord, presence of common parking area, existence of master lease, and contiguity of stores.  *See id.* at 1086–88.

Appellant argues on appeal that the Bankruptcy Court committed reversible error by failing to determine that the Lease was a shopping center lease within the meaning of Section 365(b)(3).  It argues that the Bankruptcy Court improperly determined that Appellant was adequately assured and failed to take any evidence regarding the assumption's effect on the tenant mix of the shopping center under Section 365(b)(3)(D).  (*See* Appellant's Br. 16–24; Appellant's Reply Br. 6–9.)  With respect to subsection (D), Appellant claims that Pathmark's non-operational tenancy disrupts the tenant mix, (*see* Appellant's Br. 21–22), and to the extent that it is allowed to remain dark under the Lease, this conduct violates the "intended spirit" of the

Lease, allows Appellees to "flaunt[] their obligations under the Lease," and contributes to blight and waste in violation of the Lease and New Jersey law, (*see id.* at 22–24). Appellees argue that the Bankruptcy Court correctly held that it did not need to reach this issue, "since even if the Property were a shopping center, the only relevant requirement under section 365(b)(3) would be adequate assurance that the [Appellees] will pay rent, which . . . the [Appellees] had already provided." (Appellees' Br. 15–16.)

At the Hearing, the Bankruptcy Court determined that Appellant did not carry its burden of proof in its written submissions regarding whether the Lease was for property in a shopping center, (*see* Hr'g Tr. 98:19–25); *see In re Ames Dep't Stores, Inc.*, 121 B.R. 160, 163 (Bankr. S.D.N.Y. 1990) ("A landlord seeking to avail itself of the protection of section 365(b)(3) bears the burden of proof that the area in question is a shopping center."), and the court declined to take testimony on this issue from Appellant's witness who had not been identified to Appellees prior to the Hearing, (*see id.* at 71:20–72:11), and whose testimony the court found unnecessary in any event, (*see id.* at 99:1–11). Rather, in a colloquy with Appellant's counsel, the court went through the relevance of the 365(b)(3) subsections to this case.

With respect to subsection (A), Appellant's counsel proffered that Appellees should be subject to a heightened requirement of providing Appellant with a security deposit or guarantee. (*See id.* at 87:7–11.) The court disagreed, stating that the analysis under subsection (A) is no different than the analysis that is required under Section 365(b)(1). It found that the determination of whether a security deposit or guarantee is required for adequate assurance is a factual inquiry that must be made on a case-by-case basis and, as Appellant's counsel agreed, no such deposit or guarantee is required. (*See id.* at 87:12–88:22.) It further found that because the inquiry into the source of rent under Section 365(b)(3)(A) is already undertaken under Section

17

365(b)(1)(C), subsection (A) is really only meaningful in situations, unlike here, where the lease is assigned to another lessee after it is assumed.  (*See id.* at 87:15–87:20.)  With regard to subsection (B), Appellant's counsel acknowledged that the Lease was not a percentage rent lease, which rendered that subsection irrelevant to these facts.  (*See id.* at 89:5–7.)  With respect to subsection (C), Appellant's counsel agreed with the court that this subsection was irrelevant because Pathmark, as the current tenant, was already required to comply with the provisions of the Lease.  (*See id.* at 89:8–13.)  When the court asked Appellant's counsel regarding the 365(b)(3) analysis whether "it's really just the source of rent at issue, right?," counsel responded, "Yes, Your Honor."  (*Id.* at 89:14–16.)

In his ruling in open court on Section 365(b)(3), which followed that colloquy, Judge Drain:  (1) reiterated that subsection (B) was inapplicable to the facts of this case and that subsection (C) was irrelevant, especially because the court was not dealing with an assumption and a subsequent assignment; and (2) further found that subsection (D) was irrelevant because the Lease itself did not require the store to be open and operating, and Appellant had not made any assertion that the bankruptcy case or the assumption of the Lease itself would disrupt the tenant mix or balance at the shopping center.[10]  (*See id.* at 99:12–100:9.)  Thus, the court concluded that because it was already required to consider the source of rent in connection with the Section 365(b)(1)(C) adequate assurance analysis, and it had found that Appellant was adequately assured, it did not need to decide conclusively whether the Lease was for a shopping center.  (*See id.* at 100:10–19.)  The court recognized, however, that it might need to reach the issue later "if and when the debtor decide[d] to assign the lease."  (*Id.* at 100:19–20.)

---

[10] No such assertion would have been tenable because the Pathmark store had already been dark for some time and would remain so.

I do not find that the Bankruptcy Court committed any legal or clear factual error. Appellant can hardly fault Judge Drain for declining to reach the issue of whether the Lease was for a shopping center when Judge Drain walked Appellant's counsel through subsections (A)–(C) of Section 365(b)(3), (*see id.* at 86:21–89:22), and its own counsel agreed, without objection, that only the source-of-rent provision of subsection (A) was applicable to this case, (*see id.* at 89:14–16).[11]  Further, under subsection (D), by Appellant's own admission, any effect on the tenant mix had had occurred well before the bankruptcy when the Pathmark store went dark. (*See* Bankr. Doc. 2164 ¶ 4.)  Because Pathmark was legally allowed to go dark under the Lease—and thus the tenant mix was affected outside of bankruptcy and because of circumstances other than the assumption of the Lease, (*see* Hr'g Tr. 100:3–5)—Judge Drain also did not err in his determination of the effect of the assumption on the tenant mix.

Further, Appellant has waived its arguments concerning Pathmark violating the spirit of the Lease by remaining dark, creating waste, and affecting Appellant's reversion interest.[12] These arguments were not made in Appellant's written submissions to the Bankruptcy Court or by its counsel at the Hearing, and thus the Bankruptcy Court was not able to make findings of fact with respect to them.  *See Merchants Bank v. Goodyear*, 228 B.R. 87, 88 (D. Vt. 1997) (issues not raised in bankruptcy court cannot be raised in first instance on appeal, although district court may hear arguments "if they involve only questions of law and additional findings of fact are not required") (internal quotation marks omitted).  Appellant has not explained why it

---

[11] Given that the term "adequate assurance" is intended "to be given a practical, pragmatic construction," *In re Westview 74th St. Drug Corp.*, 59 B.R. at 754, that subsections (B)–(D) were not relevant is essentially another way of saying Appellant was adequately assured on those issues.  Thus, Judge Drain's decision can be interpreted as he put it—that he did not need to reach Section 365(b)(3)—or as his having reached and addressed that Section.

[12] While the Pathmark store being dark undoubtedly has had a deleterious effect on Allaire Village Plaza, the possibility that the store would go dark was contemplated and permitted under the Lease.  While Appellant's desire to get out of the Lease is understandable, "Section 365 . . . affords no relief to a landlord simply because it might have the opportunity to rent the premises to others at a higher . . . rent and would otherwise seek to escape the bargain it made."  *In re Natco*, 54 B.R. at 441.

did not raise these particular arguments below, despite the opportunities to do so in its written objections or at the Hearing when Judge Drain directly asked Appellant's counsel about the application of Section 365(b)(3) to this case. *See Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 123 (2d Cir. 2009) ("[T]he circumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below.") (internal quotation marks omitted). Accordingly, I decline in my discretion to address these arguments for the first time on appeal, and to the extent that addressing these arguments would require me to engage in additional factfinding, they are not properly before this Court in any event.

III.   **CONCLUSION**

For the foregoing reasons, the Final Order of the United States Bankruptcy Court, dated July 8, 2011, is hereby AFFIRMED. The Clerk of the Court is respectfully directed to docket this decision and close the case.

**SO ORDERED.**

Dated: May 8, 2012
        White Plains, New York

CATHY SEIBEL, U.S.D.J.